UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

DR. RAMAN KUTTY
W140 N7866 Lilly Road
Menomonee Falls, WI 53051,

      Plaintiff,                                  Case No.:

      v.

THE MEDICAL COLLEGE OF WISCONSIN, INC.
8701 Watertown Plank Rd.
Milwaukee, WI 53226

      Defendant.

## COMPLAINT AND JURY DEMAND

COMES NOW the Plaintiff, Dr. Raman Kutty ("Dr. Kutty" or "Plaintiff"), by and through his counsel, Mawicke and Goisman, S.C., by Attorney Jennifer S. Walther, and as and for claims against the Defendant, alleges and shows to the Court as follows:

### NATURE OF ACTION AND JURISDICTION

1.      This is a civil action asserting violations of Title IX, Title VI, 42 U.S.C. §1981, and related state claims against The Medical College of Wisconsin, Inc. ("MCW") for discrimination based on race, color, and national origin, for retaliation, and for various state law claims, perpetrated by Defendant and its agents against Plaintiff while he was a student at MCW.

2.      This Court has federal question and supplemental jurisdiction in this matter pursuant to 28 U.S.C. § 1331 and § 1367 because: (i) the federal law claims arise under the statutes of the United States; and (ii) the state law claims are so closely related to the federal law

claims as to form the same case or controversy under Article III of the United States Constitution.

3. This Court also has jurisdiction pursuant to 28 U.S.C. § 1343(a)(4), which provides that the district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person: … "(4) to recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights…."

4. This Court has personal jurisdiction over Defendant on the grounds that its principal office is located in and it is conducting business in the State of Wisconsin.

5. This Court is an appropriate venue for this cause of action pursuant to 28 U.S.C. § 1391(b) as Defendant resides in this judicial district and a substantial part of the events or omissions giving rise to the claims occurred in this judicial district.

## PARTIES

6. Plaintiff, an Asian, Non-White, male of India ancestry and Hindu ethnicity, who was the exonerated subject of a false allegation under Title IX, is a natural person, citizen of the United States, and resident of the State of Wisconsin. Plaintiff was a student at MCW in Milwaukee, Wisconsin during the events described herein.

7. MCW is a private medical school and research institution. MCW is a non-stock Wisconsin corporation organized under Chapter 181 of the Wisconsin Statutes, with its principal office located at 8701 Watertown Plank Road, Milwaukee, Wisconsin, 53226, and its registered agent is John T. Newsome, Esq., located at the same address.

8. MCW is a recipient of federal funds from the National Institutes of Health ("NIH") and other federal agencies.

- 2 -

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

9.      Dr. Kutty was a student in MCW's joint MD/PhD program, known as the Medical Scientist Training Program (MSTP).  The MSTP supports medical and research training culminating in the receipt of both an MD and a PhD.  The MSTP student alternately attends both MCW's Graduate School of Biomedical Sciences and MCW's Medical School.

10.     MSTP students are considered an elite class of medical students, and candidates are selected from undergraduate programs with higher GPAs and MCAT scores than their MD-only peers.  During their training, MSTP candidates produce ground-breaking research in high volume and are trained as experts in both clinical medicine and research science.  These together make MSTP graduates highly valued and highly sought after for residency positions across the country. As they are expected to participate in academic medicine, the vast majority of MSTP graduates pursue residency at academic medical centers to allow them to further their research careers.

11.     Dr. Kutty has been continuously enrolled in the MSTP since 2013.

12.     Upon Dr. Kutty's acceptance into MCW's MSTP, MCW provided Dr. Kutty with its All Student Handbook and its Medical Student Handbook which highlights the school's policies and procedures related to students' conduct and disciplinary matters.

13.     Dr. Kutty agreed to be bound by the policies and procedures in the Handbooks as a condition of his education through MCW.

14.     Dr. Kutty graduated from MCW having obtained both degrees under the MSTP on May 17, 2019.

15.     In the Spring of 2015, Dr. Kutty was the subject of what was ultimately determined to be a completely unfounded Title IX complaint.  A female medical student ("KH",

Caucasian), with whom Dr. Kutty had a consensual sexual encounter in March of 2014, filed a Title IX complaint with MCW's Title IX office in the Spring of 2015, wrongfully claiming she had been the subject of sexual misconduct by Dr. Kutty from late 2013 to early 2014 (the "Complaint").

16.     Originally, MCW's Title IX office rejected KH's Complaint as the alleged conduct did not occur at MCW or an MCW event, but the Title IX office subsequently agreed to investigate the Complaint through the Title IX Committee at KH's urging.

17.     The Title IX Committee began its investigation of the Complaint in August of 2015 (the "Investigation").  Dr. Kutty fully participated in and cooperated with the Investigation.

18.     At that time, Dr. Kutty was a student in the Graduate School, on a leave of absence from the Medical School in accordance with the MSTP.

19.     During the Investigation, KH recanted many of her accusations.  She also attempted to have a witness change her testimony, but the witness refused to do so.

20.     Previously, KH had an extra-marital affair with a fellow MSTP student, Max Cayo (Caucasian), and she ultimately left her husband to continue her relationship with Dr. Cayo.

21.     Dr. Cayo had been arrested at an annual MCW MSTP retreat in late 2014:  He was severely intoxicated, verbally abusive to his girlfriend, other students, and other hotel patrons, destroyed hotel property, attempted to break down a door, and had on his person a loaded handgun with a second, loaded clip in his hotel room.  The next morning, MCW's Director of the MSTP stated that Dr. Cayo "is remorseful and will be welcomed back with open arms."

- 4 -

22.     During the Investigation, Dr. Cayo supplied to the investigators what he said were personal text messages from 2012-2013 between Dr. Cayo, Dr. Kutty, and Steve Blinka (Caucasian), a third male MSTP student (the "Cayo Texts"). The Cayo Texts purportedly showed the three students engaged in crude and offensive joking in general, but not about KH. The Title IX Committee did not give Dr. Kutty a copy of the text messages.

23.     In November of 2015, the Title IX Committee issued a lengthy determination in which it completely exonerated Dr. Kutty of and found him not responsible for all accusations against him, and recommended no disciplinary action against him (the "Title IX Determination").

24.     Not only was Dr. Kutty absolved, but the Title IX Committee was highly critical of KH, noting that she had a motive to fabricate her accusations of assault based on her relationship with fellow student Dr. Cayo, that she attempted to interfere with the investigation by coordinating witness testimony, that she changed her story, and that she provided false and misleading information.

25.     Upon information and belief, KH was not subject to any discipline for her conduct or her unprofessional behavior, including lying to an investigative committee and witness tampering.

26.     Further, the Title IX Committee found that Dr. Cayo was also incredible. The committee noted that the Cayo Texts were suspect and incomplete because he only submitted select portions, that Dr. Cayo's statements did not match the text messages, and that his relationship with KH and his "desire to protect himself in his academic situation provide him with a significant motivation to not be truthful."

- 5 -

27.     Although the Title IX Determination exonerated Dr. Kutty of all wrongdoing alleged in the false Complaint, thereafter, Dr. Kutty began to experience a campaign of harassment, discrimination, retaliation and unfair requirements and discipline from MCW officials that harmed his educational and career opportunities.

28.     In January 2016, although Dr. Kutty had already been exonerated and successfully defended himself in the Investigation, the Director of the MSTP, Dr. Joseph Barbieri, requested that Dr. Kutty excuse himself from MSTP events due to KH's allegations. Because MCW's Title IX office exonerated Dr. Kutty, Dr. Kutty rejected that request.

29.     In March of 2016, Dr. Barbieri and Associate MSTP Director Dr. Gil White renewed the request that Dr. Kutty limit his participation in MSTP events due to KH.  Dr. Kutty again rejected the request based on his proven innocence.

30.     Upon information and belief, MCW did not make the same request of KH, although she was found to have fabricated allegations against Dr. Kutty and attempted to change witness testimony.

31.     The MSTP events provided Dr. Kutty with educational opportunities and significant social interaction with peers, so MCW's request would have deprived Dr. Kutty of these benefits, beyond the ostracization Dr. Kutty already faced due to KH's false allegations, had he not been allowed to attend.

32.     KH appealed the Title IX Determination, which was then reviewed by MCW's Title IX Appeal Committee.

33.     On April 11, 2016, the Title IX Appeal Committee issued a report in which it agreed with the original conclusions of the investigation committee as set forth in the Title IX Determination and exonerated Dr. Kutty (the "Appeal Report").

- 6 -

34.   In the Appeal Report, the Title IX Appeal Committee addressed the Cayo Texts for the first time, characterizing them as "joking."

35.   The Appeal Committee recommended that MCW provide training on professionalism to all of the MSTP students involved in the personal Cayo Texts.  The Appeal Committee did not recommend any disciplinary action.

36.   On May 31, 2016, Dr. Kutty was meeting with MCW's then-Associate Dean for Student Affairs, Nancy Havas, M.D. (Caucasian), to discuss the routine matter of extending his leave of absence from the Medical School for one year, which is customary for MSTP students as they are getting a joint degree.

37.   At the conclusion of Dr. Kutty's meeting with Dean Havas, Dean Havas mentioned to Dr. Kutty that she had decided she would be placing Dr. Kutty on disciplinary probation upon his return to the Medical School.

38.   Dean Havas did not give Dr. Kutty any notice of the grounds for such a finding or ask him any questions to determine what happened.  When Dr. Kutty asked why Dean Havas would be placing him on probation, she simply stated that she would set up a meeting to discuss the matter with him later.

39.   The MCW Medical Student Handbook in effect at the time of the events in question provides for a procedure prior to imposing discipline on a student:

> When an allegation of professional misconduct (dishonest, unethical or irresponsible behavior) is made, the Associate Dean for Student Affairs shall provide notice to the student concerning the grounds raised which may constitute a violation of the rules of professional conduct. The Associate Dean for Student Affairs, or his/her designee, will, at his or her discretion and with consultation as deemed necessary, investigate the allegations and attempt to determine the merit and validity of the allegations. The investigation, at a minimum, shall include an interview with the student.

(MCW Medical Student Handbook, p. 33)

40.     Dean Havas did not provide Dr. Kutty with notice of the grounds for an alleged violation of any rule, did not tell him what rule he supposedly violated, did not indicate that she undertook any investigation whatsoever to determine the validity or merit of any accusation that might warrant discipline, and did not interview Dr. Kutty before making her decision as required by this rule.

41.     In June of 2016, Dr. Kutty was summoned to a meeting with Dean Havas and Ravi Misra PhD, the Dean of MCW's Graduate School of Biomedical Sciences (Indian). Before the meeting, Dr. Kutty asked by email what the meeting was about, and Dean Havas responded only that "this meeting is a discussion of professional expectations for communications and behaviors…no other individuals are invited, or permitted, to attend."

42.     The meeting between Dean Havas, Dean Misra, and Dr. Kutty, occurred on June 20, 2016 (the "June Meeting").

43.     During the June Meeting, Dean Havas stated that she was placing Dr. Kutty on disciplinary probation when he returned to the Medical School based on the Cayo Texts produced during the Investigation, although the Title IX Committee found the Cayo Texts were suspect and incomplete (the "Disciplinary Probation").

44.     During the June Meeting, Dean Havas very briefly showed some text messages to Dr. Kutty, but he did not have any time or opportunity to fully review them or verify their authenticity or completeness.

45.     To date, Dr. Kutty has not been given a copy of the text messages upon which any MCW decision was based for his review, despite multiple requests.

- 8 -

46.     During the June Meeting, Dr. Kutty expressed concern that Dean Havas did not appear to have reviewed the entire text exchange, including Dr. Kutty's attempts to remove himself from that exchange.

47.     During the June Meeting, Dr. Kutty asked Dean Havas if the probation would be included in his record, including his Medical Student Performance Evaluation (MSPE), known as the "Dean's Letter."

48.     The Dean's Letter accompanies a medical students' residency application and is supposed to summarize the student's medical school performance and provide a summary evaluation of the student's potential as a resident.  This is a significant record that residency programs will review in determining whether to accept a residency applicant.

49.     The residency application process culminates in The Match, a matching algorithm operated by the National Resident Matching Program (NRMP).  In The Match, program directors supply preferential-order lists of applicants and applicants do the same for programs at which they interviewed.  The Match then assigns residents to programs using these lists by way of a modified algorithm. The entire process is automated and Match results are final. The third Friday of March is termed "Match Day" and across the country medical schools traditionally celebrate this as a significant achievement both for the students and the faculty.

50.     During the June Meeting, Dean Havas unequivocally stated that the probation would not be included in his MSPE, would not be released to any external institutions, and would not have any negative implications for him as far as his residency application or matching. Specifically, Dean Havas stated the probation "shouldn't have any negative implications for you as far as residency or matching. It doesn't go in your dean's letter, any of that. What it does, is it puts you on notice that you have no room for professional misconduct of any kind."  She stated

- 9 -

again that "it will not go into your dean's letter. It will not be released as part of your academic transcript. It will not be listed anywhere that anyone would see other than internal use."

51.     The Disciplinary Probation as Dean Havas described it in the June Meeting was nothing more than a reprimand without any negative consequences.

52.     Dean Misra concurred, stating that with respect to the probation, "there will be no consequence for it going forward." He stated that the Disciplinary Probation would simply sit in an electronic file somewhere and that would be the end of it.

53.     Dean Misra, acting on behalf of the Graduate School, did not place Dr. Kutty on probation or impose any discipline on him.

54.     After the June Meeting, Deans Havas and Misra sent a letter to Dr. Kutty dated June 30, 2016, which stated that based on "disturbing and inappropriate communications between you and your MSTP colleagues that occurred in the past two years," although the Cayo Texts dated from more than two years earlier to 2012-13, MCW was issuing "a letter of reprimand" from the Graduate School and he would be on "Disciplinary Probation" when he returned to the Medical School.

55.     The MCW Medical Student Handbook in effect at the time identified "Disciplinary Probation" as "formal action that establishes conditions upon a student's continued attendance in school, after failure to comply with the Professional Behavior policy."

56.     The Discipline Letter did not identify what specific policy Dr. Kutty violated. In fact, the "Professional Behavior Policy" contained in MCW's Medical Student Handbook merely broadly states that MCW expects "honest, ethical, and responsible behavior," and provides for the reporting of "dishonest, unethical or irresponsible behavior," but does not provide any specific prohibitions or any guidelines for judging compliance.

57.     The MCW Medical Student Handbook in effect at the time further stated that if Disciplinary Probation is imposed "the student will be notified, in writing, of the probation and conditions thereof. … Probation may be imposed for a specified length of time or until graduation."

58.     The letter did not give any end date to the probation or any way in which the probation could be modified or discontinued.  Further, it did not list any conditions of probation, such as inclusion in the Dean's Letter or exclusion of participation in away rotations.

59.     While Dr. Kutty disagreed with Dean Havas's decision and expressed his disagreement at the June Meeting, he did not challenge the decision because he relied on the two Deans' explicit assurances that his probation would not affect his Dean's Letter, and that it would have no negative consequences to his education and career.

60.     On July 21, 2016, Dr. Kutty requested from MCW copies of the text messages that formed the basis for the probation decision.  To date, MCW has not complied with this request.

61.     Dr. Kutty was informed by Dr. Blinka, one of the participants in the Cayo Texts, that Dr. Blinka had not received any discipline or reprimands for his involvement in the Cayo Texts, and neither Dr. Kutty nor Dr. Blinka was aware of any discipline imposed on Dr. Cayo for his participation in the Cayo Texts.

62.     In May of 2017, Dean Havas left MCW and was replaced by Carol Ping-Tsao, MD, JD (Asian) as Associate Dean of Student Affairs.

63.     On February 16, 2018, more than one and a half years after the June Meeting and the Disciplinary Probation was imposed, Dean Tsao informed Dr. Kutty via email that he would not be allowed to participate in any away rotations due to his probationary status.

- 11 -

64.     This was the first indication Dr. Kutty had that, contrary to the promises Dean Havas made in the June Meeting, there were negative consequences to his educational opportunities as a result of the probation.

65.     Dean Tsao did not tell Dr. Kutty how or why the probation would limit that opportunity. There is no correlation between an old text message and the ability to do an away rotation, and MCW did not state there was.

66.     MCW's denial of the away rotations was damaging to Dr. Kutty because they were a critical aspect of Dr. Kutty's opportunity for success. MCW knew Dr. Kutty had a low USMLE Step 1 score. The score essentially operates as an objective cut-off point for residency interviews. Students with low scores like Dr. Kutty, however, have an opportunity to counteract that low score through away rotations, which give the student opportunities to essentially act as interns at programs that might otherwise exclude them. Many administrators view these away rotations as the best indicator of an applicant's abilities as a resident, more than Board scores or clinical grades. It is therefore very common and well-known that students in that position perform away rotations to improve their residency prospects, and they do in fact improve those prospects. Yet, MCW arbitrarily denied Dr. Kutty that opportunity.

67.     Dr. Kutty met with Dean Tsao about the away rotations on March 1, 2018.

68.     In that meeting, Dean Tsao indicated "it is the practice of the Deans to report out Academic and Disciplinary Probation terms in the MSPE."

69.     This was the first indication that Dean Havas's assurances from the June Meeting that the probation would not go on his Dean's Letter may not have been true.

70.     Dr. Kutty asked whether he could appeal this situation, and demonstrating MCW's lack of consistent procedures, Dean Tsao responded there was nothing that could be done at that point.

71.     Based on Dean Tsao's misinformation, Dr. Kutty spent the next several months attempting to determine MCW's rules and procedures with respect to the probation, which components of the student record would be disclosed, and what his appeal rights were. Those efforts included communicating with MCW's Registrar, Dean Tsao, Dr. Richard Holloway (appointed Temporary Dean during Dean Tsao's leave of absence), Dean Misra, former Dean Havas, and William Hueston, MD (Senior Associate Dean for Medical Education). Dr. Kutty received contradictory messages about his appeal rights from each of these sources, including Dean Tsao telling him he could not appeal, and Dean Holloway telling him he could write to MCW's Academic Standing and Professionalism Committee ("ASPC").

72.     The ASPC is purportedly responsible for formulating "clear guidelines in regard to academic status and advancement." Any student who "encounters academic difficulties (including professional conduct related to academic performance) will be brought to the attention of the Committee."

73.     In response to these attempts, Dr. Kutty received a letter dated June 25, 2018 from MCW Associate General Counsel Attorney Elizabeth Drew.

74.     Ms. Drew's letter made clear that MCW would not change its position on the probation, that MCW had no standards associated with disciplinary action occurring outside of the School of Medicine, and that she did not believe Dr. Kutty's description of Dean Havas's promise, claiming that he had "misunderstood" what Dean Havas told him.

- 13 -

75.     Further, Ms. Drew stated that the ASPC had reviewed Dr. Kutty's "record" and would not terminate his probation, but she failed to indicate any rationale for that decision.

76.     Finally, Ms. Drew stated MCW followed the recommendations of the Association of American Medical Colleges ("AAMC") with respect to reporting "citations for professionalism." The AAMC standard Ms. Drew claimed MCW followed states: "If the student was cited for unprofessional behavior, please describe the incident and any actions taken to remediate the professionalism concerns….describe how the medical school defines professionalism and what it assesses in students."

77.     No one from MCW had notified Dr. Kutty that the ASPC would be conducting a "review" of his "record," and the ASPC did not ask Dr. Kutty for any information or for his version of events, so it apparently made a decision about Dr. Kutty's probation without hearing from him.

78.     Dr. Kutty was not given any information about what information the ASPC reviewed, or what the basis for its decision was.

79.     In June of 2018 MCW allowed all students to submit choices for which Dean would write their Dean's Letter. Dr. Kutty had provided his choice of three Deans, none of which were Dean Tsao. MCW ignored Dr. Kutty's choices and assigned Dean Tsao as Dr. Kutty's letter writer anyway.

80.     Dr. Kutty met with Dean Tsao on August 11, 2018 to discuss his Dean's Letter. In that meeting Dean Tsao for the first time stated Dr. Kutty could appeal his probation to the ASPC (the same group who had already conducted a "review" of his "record" and declined to reverse the probation without any input from him), contradicting her earlier statement in March that he could not appeal the decision.

- 14 -

81.     In an effort to internally resolve this problem with MCW and avoid the negative consequences of the wrongfully imposed Disciplinary Probation, and in the absence of a clearly published procedure to rectify or appeal these decisions, Dr. Kutty provided the above facts to the following MCW officials throughout early to mid-September: John Raymond, MD (President and CEO), Joseph Kerschner, MD (Dean, MCW School of Medicine), William Hueston, MD (Senior Associate Dean for Medical Education), Carol Tsao, MD (Associate Dean for Student Affairs), Robert Chun, MD (Chair, ASPC), and Todd Hoagland, PhD (Vice-Chair, ASPC). None of these MCW officials identified any appeals process. Instead, they all merely affirmed Dean Tsao's authority to continue the probation. No one asked for, or even seemed concerned about, Dr. Kutty's evidence, whether others were disciplined for the same behavior, whether an investigation had been conducted before discipline was imposed or continued, or the fact that MCW had never given Dr. Kutty his own copy of the alleged text messages upon which the discipline is based.

82.     On September 4, 2018, Dean Tsao gave Dr. Kutty a draft of her Dean's Letter. The draft showed for the first time that the Dean's Letter included a reference to the Disciplinary Probation.

83.     Because a reference to disciplinary probation on the Dean's Letter negatively affects Dr. Kutty's academic record and thus his residency opportunities, Dr. Kutty requested that Dean Tsao remove or modify the information regarding the probation in the Dean's Letter, consistent with Dean Havas's promise in the June Meeting, but Dean Tsao refused to do so.

84.     On October 19, 2019, Dean Tsao issued the final version of the Dean's Letter, which is the letter that was submitted with Dr. Kutty's residency applications. The final version also refers to the Disciplinary Probation in three specific sections.

- 15 -

85.     The Dean's Letter does not discuss any actions taken to remediate the professionalism concerns nor describe how the medical school defines professionalism as required by the AAMC standards MCW supposedly followed.

86.     As a result of the negative Dean's Letter, Dr. Kutty received only one interview at an academic medical center, and only 4 other interviews all of which were at community hospitals.

87.     From the NRMP, Internal Medicine, all applicants average more than 12.6 interviews.  An MD/PhD candidate should expect even more than these as they are very competitive applicants.  Thus, Dr. Kutty should have had somewhere between 15-20 interviews, all of them at academic institutions.  But MCW's discriminatory actions directly contributed to this lower turnout than should have been expected under the circumstances.

88.     Subsequent to these events and Dr. Kutty's repeated efforts to challenge the discriminatory and retaliatory discipline, MCW further punished Dr. Kutty for making a complaint in the first place.

89.     In October of 2018, Dr. Kutty requested that Dr. Barbieri, the person who expected Dr. Kutty not to participate in MSTP events, help with his residency applications as he had received very few invitations to interview.  Dr. Barbieri failed to help, even though that was his role, and did not provide Dr. Kutty with information about residency counselors who could have helped had Dr. Kutty known they existed.

90.     In October of 2018, Dean Tsao denied Dr. Kutty's request, prepared in conjunction with and approval from Dr. Kutty's clinical advisor, for a simple rearrangement of his clinical rotation schedule to retake his Board exams after a score was expunged due to a technical problem with the exam itself.

- 16 -

91. Dean Tsao informed Dr. Kutty by email on January 18, 2019 that the ASPC had decided to continue his Disciplinary Probation because of his "ongoing conduct," which she described as his letters to the faculty. His letters, however, complained of MCW's unfair treatment with respect to the discipline, and attempted to determine how to rectify the wrong.

92. On February 21, 2019, the ASPC called Dr. Kutty to a meeting to review the status of his Disciplinary Probation.

93. In anticipation of this meeting, Dr. Kutty asked Dean Tsao for information about or a summary of the investigation that was conducted to support the Disciplinary Probation or the continuation thereof. Dean Tsao responded that she would not provide Dr. Kutty with this information.

94. Upon information and belief, such information does not exist as no investigation was conducted.

95. In the February 21 meeting, the ASPC members repeated the discussion about "the incident" now dating to six years ago. During this meeting, members of the ASPC told Dr. Kutty that his bringing forth his complaints of unlawful treatment and his attempts to challenge the unfairness of the discipline were "too aggressive" and they implied that he was lying about the promises Dean Havas made.

96. Dean Tsao then sent Dr. Kutty a letter dated February 22, 2019, which he received on February 27, 2019, notifying Dr. Kutty that the ASPC decided to continue his Disciplinary Probation, while giving absolutely no explanation for that decision. Dean Tsao informed Dr. Kutty that his status would be "re-reviewed prior to your graduation." Dean Tsao stated "another more detailed correspondence will follow," but she never provided any further information or correspondence.

- 17 -

97.     On March 11, 2019, Dr. Kutty was informed by the NRMP that he matched to a 1-year residency program at a community hospital, indicating that all of the other 46 programs he had applied to either did not interview him or did interview him but did not find his application competitive enough to match.

98.     For someone with Dr. Kutty's credentials and dual degrees, he should have matched to a three- or six-year program at an academic institution.

99.     On April 9, 2019, Dr. Kutty filed a complaint with the Liaison Committee on Medical Education (LCME), an accrediting body for educational programs at schools of medicine in the United States and Canada, due to MCW's violation of numerous LCME standards required for a medical school to obtain or maintain accreditation. Amongst the standards MCW violated include the following:

   a. "A medical school does not discriminate on the basis of age, creed, gender identity, national origin, race, sex, or sexual orientation." Dr. Kutty explained to the LCME how he was treated differently from other similarly situated students not in protected categories with respect to discipline and other negative actions.

   b. "A medical education program defines and publicizes its code of professional conduct for the relationships between medical students, including visiting medical students, and those individuals with whom students interact during the medical education program." MCW had not specifically defined or publicized a code of professional conduct. It merely published some broad platitudes that did not put Dr. Kutty on notice that the specific alleged conduct for which he was disciplined would violate a policy.

- 18 -

c. "A medical school develops effective written policies that address violations of the code, has effective mechanisms in place for a prompt response to any complaints, and supports educational activities aimed at preventing inappropriate behavior." While MCW had a policy requiring investigation of complaints of unprofessional conduct, MCW did not investigate before determining Dr. Kutty was supposedly "unprofessional." MCW never told Dr. Kutty how he could rehabilitate himself, and declined to implement the Title IX Appeal Committee recommendation for education, thus not providing the required "educational activities aimed at preventing inappropriate behavior."

d. "Mechanisms for reporting violations of the code of professional conduct are understood by medical students, including visiting medical students, and ensure that any violations can be registered and investigated without fear of retaliation." MCW had not investigate, or provide a retaliation free environment when Dr. Kutty was criticized and subjected to continued punishment for exposing this violation.

e. "A medical school ensures that the medical education program has a single standard for the advancement and graduation of medical students across all locations and a fair and formal process for taking any action that may affect the status of a medical student, including timely notice of the impending action, disclosure of the evidence on which the action would be based, an opportunity for the medical student to respond, and an opportunity to appeal any adverse decision related to advancement, graduation, or dismissal." MCW: had no process, let alone a fair and formal process for taking disciplinary action; did not give Dr.

- 19 -

Kutty notice prior to deciding to impose discipline; did not disclose the evidence upon which the discipline would be or ultimately was based; made the decision to discipline and continue the discipline without giving Dr. Kutty an opportunity to respond; and had no appeal procedure, even gaving him conflicting accounts about his rights to appeal the discipline that adversely affected his advancement.

100.    Based on this information, the LCME notified Dr. Kutty that it would investigate MCW for violating LCME standards.

101.    On May 7, 2019, Dr. Kutty met with MSTP Program Director, Joseph Barbieri, PhD and Associate Director Gilbert White, MD, to discuss his future.

102.    In the course of that meeting Dr. White informed Dr. Kutty that Dr. Kutty was denied residency at MCW because of the Disciplinary Probation and the Dean's Letter was damaging to his residency applications.

103.    Because Dean Tsao had informed Dr. Kutty that his probation status would be "re-reviewed" before his graduation, Dr. Kutty sent Dean Tsao an email on May 16, 2019, asking about the status of the probation.

104.    Dean Tsao responded by email the same day informing Dr. Kutty that his probation would "continue through graduation." On May 21, 2019, Dean Tsao responded with a formal letter (backdated to May 14, 2019), stating the ASPC met on May 13, 2019 and "the Committee decided to keep you on Disciplinary Probation."

105.    No one had informed Dr. Kutty that the ASPC would meet to discuss his status, they did not obtain any input or information from Dr. Kutty about that decision, and he was not notified of either the decision or the reasons therefore until after he requested information about the status.

- 20 -

106. After Dr. Kutty's graduation, MCW announced a new Code of Conduct, now described as "honest, clear and transparent," in acknowledgement of the lack of such qualities in its past policies.

## FIRST CAUSE OF ACTION:
## RETALIATION IN VIOLATION OF
## TITLE IX OF THE EDUCATION AMENDMENTS ACT OF 1972

107. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

108. Title IX of the Education Amendments of 1972 provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

109. Title IX of the Education Amendments of 1972 applies to an entire school or institution if any part of that school receives federal funds.

110. Defendant receives federal funding.

111. The Title IX regulations prohibit retaliation and protect any individual who "participated in any manner in an investigation…." 34 C.F.R. §100.7(e).

112. That regulation "protects the subject of a sexual harassment claim." *Wilkerson v. Univ. of N. Texas*, 223 F. Supp. 3d 592, 603 (E.D. Tex. 2016).

113. MCW states in its Title IX policy that "retaliation against any individual making a report under this policy or any individual participating in an investigation in connection with this policy is prohibited."

114. Dr. Kutty engaged in legally protected activity as he was the ultimately exonerated subject of a Title IX complaint, he participated and provided evidence in the Title IX

investigation of the complaint against him, and was defending himself and asserting his rights to be free from unfounded accusations.

115.     His complaints to MCW officials about the unfair treatment he received with respect to the Disciplinary Probation as the exonerated subject of the Title IX complaint also constitute protected activity.

116.     Dr. Kutty suffered adverse actions, and adverse educational and career opportunities based on the decisions and actions of MCW.

117.     Dr. Kutty was put on Disciplinary Probation in 2016 by MCW, based on the Cayo Texts that surfaced during the 2015 Title IX Investigation when Dr. Kutty was in the Graduate School, describing purported private conversations that occurred outside of MCW in 2012-2013, when Dr. Kutty was in the Graduate School.

118.     The discipline was indefinite and caused adverse consequences in 2018 when Dr. Kutty was denied away rotations which were critical to his opportunity for success, and MCW referred to the Disciplinary Probation in his Dean's Letter thereby harming his residency applications.

119.     Dr. Kutty was further subjected to a continuing pattern of unlawful harassment when MCW officials beginning in January 2016.

120.     From January through March of 2016, MCW's MSTP officials repeatedly engaged in a campaign to deprive Dr. Kutty of educational opportunities and significant social interaction with peers by requesting that he not attend MSTP events based on KH's unfounded allegations.

- 22 -

121.     Later, in the Fall of 2018, Dr. Kutty's refusal to accede to this wish caused further retaliatory acts when Dr. Barbieri failed to help Dr. Kutty with residency interviews despite his direct request for help.

122.     Dr. Kutty was subject to further retaliatory actions in that the ASPC, a completely different set of decision-makers from the original decision-maker who imposed the Disciplinary Probation, decided for different reasons to continue his Disciplinary Probation status in January 2019, again in February of 2019, and again in May of 2019, because he was asserting his protected rights with respect to the unfair imposition of the discipline in the first place.

123.     MCW specifically told Dr. Kutty that MCW made those decisions because he was too aggressive in complaining about unfair treatment.  Thus, MCW took these adverse actions because of Dr. Kutty's protected activity in defending himself as the subject of the Title IX complaint.

124.     MCW based the Disciplinary Probation, and the consequent harmful actions in 2018, on a purported violation of a professionalism standard that is ambiguous and is nowhere defined.  In fact, the discipline remained in place through Dr. Kutty's graduation, though it relates to a relatively minor infraction dating back to 2012-13, and is arguably unsanctionable by the Medical School in any event given it involved private, extra-mural conversations while in the Graduate School.

125.     MCW failed to follow its own policies and procedures and LCME standards, including, but not limited to: ignoring the recommendations of its Title IX Appeal Committee to provide training, not discipline, to all students involved in the personal text exchange; issuing the discipline without any notice or investigation, opportunity to review the evidence upon which it was based, or right to appeal the decision; failing to identify any conditions of his Disciplinary

- 23 -

Probation or an end date; and holding secret meetings of which Dr. Kutty was not notified and in which Dr. Kutty was not allowed to participate at which his educational and career opportunities were decided.

126.     MCW, through Deans Havas and Misra misrepresented the consequences of the Disciplinary Probation, and then MCW changed course in justifying the subsequent harmful consequences in violation of those representations.

127.     MCW officials repeatedly gave different and often conflicting accounts of MCW procedures and Dr. Kutty's appeal rights.

128.     Dr. Kutty received increased scrutiny and hostility as a result of his participation in the events the subject of the Title IX Complaint, including but not limited to:  repeated accusations from the ASPC about being too aggressive; denial of a minor and recommended schedule change to assist him in taking his Board exam; and failure to assist him with residency applications as requested.

129.     Dr. Kutty was treated differently from similarly situated students who were not the subject of a false Title IX claim.  The two other MCW students who equally participated in or even instigated the Cayo Texts, Dr. Cayo and Dr. Blinka, were not, upon information and belief, disciplined, denied away rotations, given a negative notation on their Dean's Letters, or subject to any ongoing consequences for the same purportedly unprofessional conduct associated with the text messages.

130.     As a result, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## SECOND CAUSE OF ACTION:
## VIOLATION OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964

131. Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

132. Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, et. seq. ("Title VI") prohibits recipients of federal financial assistance from discrimination based on race, color or national origin. Title VI states that: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."

133. MCW is a recipient of federal funds.

134. Dr. Kutty is a member of several protected classes in that he is Asian, he is Non-White, and his national origin is from India.

135. Dr. Kutty was a student of MCW's MSTP Program and therefore was eligible for MCW's educational opportunities on an equal basis.

136. MCW subjected Dr. Kutty to adverse actions and harm by subjecting him to unwarranted discipline for pre-Medical School personal conduct, denying him away rotations that would benefit his career, issuing a negative Dean's Letter that harmed his residency prospects, denying him a simple change in clinical rotations to help him take Board examinations, and denying him assistance with residency applications. MCW repeatedly stigmatized Dr. Kutty by imposing Disciplinary Probation indefinitely, purportedly for unprofessional conduct.

137. MCW treated similarly situated White students not in a protected class differently with respect to these actions.

138. MCW does not have a legitimate non-discriminatory reason for taking these adverse actions, as it did not have a specific policy prohibiting Dr. Kutty's alleged behavior, and

it was purportedly related to a relatively minor infraction dating back to 2012-13, involving private, extra-mural conversations while Dr. Kutty was in the Graduate School, not the Medical School which issued the Disciplinary Probation.

139.     Any explanation MCW may create for its decisions would merely be a pretext to mask discriminatory motives, because:

a.  MCW based the Disciplinary Probation, and the consequent harmful actions in 2018, on a purported violation of a professionalism standard that is ambiguous and is nowhere defined.

b.  MCW issued the Disciplinary Probtaion to Dr. Kutty without any notice or investigation, or any opportunity for Dr. Kutty to meaningfully review or challenge the evidence upon which it was based, in violation of its own rules.

c.  The Disciplinary Probation did not list any conditions and did not identify any end date as required under MCW's policies.

d.  MCW never told Dr. Kutty how to rehabilitate himself or work towards removing the discipline, belying any claim there is any behavioral or educational goals associated with the punishment.

e.  MCW issued the Disciplinary Probtaion based upon a false promise that it would not be included in the Dean's Letter or otherwise negatively affect his academic career.

f.  MCW issued the Disciplinary Probation without any published procedure for review or appeal, and contradictory statements from virtually every MCW official about what the appeal process was.

140.     Finally, Dr. Kutty was the only person singled out for discipline and substantial harm to his future career prospects although other students engaged in the exact same or *much worse* behavior and were not similarly disciplined.  For example, Dr. Cayo was found to have been unreliable and untruthful with respect to the investigation, including the selectively identified text messages, but he was not upon information and belief disciplined for participating in the wrongful victimization of Dr. Kutty.  In addition, Dr. Cayo was involved in a much worse instance of public drunkenness, brandishing a weapon, and violent and destructive behavior that led to his arrest, but MCW "welcomed him back with open arms."

141.     As a result of MCW's failure to comply with Title VI, Dr. Kutty has suffered damages in an amount to be proven at trial.

### THIRD CAUSE OF ACTION: VIOLATION OF 42 U.S.C. § 1981 – RACIAL DISCRIMINATION

142.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

143.     The Civil Rights Act of 1964, 42 U.S.C. Section 1981 prohibits discrimination based on race, as follows:  "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

144.     The phrase "to make and enforce contracts" refers to "the making, performance, modification and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  42 U.S.C.A. § 1981.

Case 2:19-cv-00816-WED   Filed 05/30/19   Page 27 of 33   Document 1

145.    In order to make a claim of racial discrimination under 42 U.S.C. § 1981, a plaintiff must show that the defendant intentionally discriminated against the plaintiff on the basis of race and that the defendant's actions were motivated by discrimination.

146.    Dr. Kutty applied to MCW, accepted an offer of admission to MCW, enrolled at MCW, and paid all associated tuition, fees and expenses.

147.    Dr. Kutty did so in reliance on his understanding, and with reasonable expectation that MCW would implement and enforce provisions and policies set forth in its official publications, including its All Student Handbook, its Medical Student Handbook, and its Title IX Policy.

148.    As such, an express contract or, alternatively, a contract implied in law or in fact was formed between Dr. Kutty and MCW.

149.    The MCW All Student Handbook states that, "MCW policy expressly prohibits any harassment or discrimination, based upon sex, age, religion, disability, marital status, national origin, sexual orientation, gender identify [sic], and any other basis prohibited by law or regulation"; "The Medical College of Wisconsin does not discriminate in any manner contrary to law"; and "all persons shall have equal access to all programs and facilities without regard to race, age, color, religion, national origin, sex, gender identity, disability, sexual orientation, veteran's status or any other protected class."

150.    Dr. Kutty, an Asian, non-White male who is of Indian ancestry and Hindu ethnicity, was denied the full enjoyment of the benefits of his contractual relationship with MCW, including the right to fully participate in and enjoy unimpeded academic and career opportunities, by being singled out for a wrongfully imposed Disciplinary Probation that negatively affected his career opportunities.

- 28 -

151.     No legitimate reason was provided for this wrongful and disparate treatment. MCW does not have legitimate non-discriminatory reasons for its actions, as there is no specific or clear policy addressing the purported conduct and MCW did not treat individuals the same who engaged in the same or worse conduct but were not in any protected class.

152.     Upon information and belief, MCW has not imposed Disciplinary Probation on other students who were not in a protected class for the same as or more serious acts that could be characterized as "unprofessional."

153.     As such, Dr. Kutty was denied the full and equal benefit of the law due to his status as an Asian, non-White male.

154.     As a result of MCW's failure to comply with Section 1981, Dr. Kutty has suffered damages in an amount to be proven at trial.

<strong><u>FOURTH CAUSE OF ACTION:</u></strong><br><strong><u>STATE LAW BREACH OF CONTACT</u></strong>

155.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

156.     Dr. Kutty applied to MCW, accepted an offer of admission to MCW, enrolled at MCW, and paid all associated tuition, fees and expenses.

157.     Dr. Kutty did so in reliance on his understanding, and with reasonable expectation that, MCW would implement and enforce provisions and policies set forth in its official publications, including its All Student Handbook, its Medical Student Handbook, and its Title IX Policy, as well as follow policies and standards necessary to its accreditation of which Dr. Kutty was the beneficiary as required by the LCME and AAMC.

158.     As such, an express contract or, alternatively, a contract implied in law or in fact was formed between Dr. Kutty and MCW.

159.    The contract contained an implied covenant of good faith and fair dealing, which implicitly guaranteed that any proceedings would be conducted with basic fairness.

160.    Based on the aforementioned facts and circumstances, MCW breached its express and/or implied agreement(s) with Dr. Kutty, and the covenant of good faith and fair dealing contained therein.

161.    Defendant committed several breaches of its agreement with Dr. Kutty during the disciplinary process.  A non-exhaustive list of MCW's breaches include the following:

    a.  The Associate Dean for Student Affairs did not, as required under the MCW Medical Student Handbook, provide notice to Dr. Kutty of the grounds raised which may constitute a violation of the rules of professional conduct before making a decision about imposing Disciplinary Probation.

    b.  The Associate Dean for Student Affairs did not, as required under the MCW Medical Student Handbook, investigate the allegations and attempt to determine the merit and validity of the allegations, and did not interview Dr. Kutty about the allegations, before making a decision about imposing Disciplinary Probation.

    c.  The Disciplinary Probation Letter did not, as required under the MCW Medical Student Handbook, notify Dr. Kutty of the conditions of the probation, nor the duration, whether a specified length or until graduation.

    d.  The ASPC did not, as required under MCW's Medical Student Handbook, formulate "clear guidelines" regarding Dr. Kutty's academic status and advancement, neither with respect to the prohibited conduct that purportedly warranted discipline nor with respect to the measures he must take to rehabilitate himself.

- 30 -

e. The ASPC did not, as required under MCW's Medical Student Handbook, "utilize all information available to it" in "reaching its decisions" about Dr. Kutty, and in fact often met and made decisions about Dr. Kutty without his knowledge or input at all.

f. MCW's actions did not comply with the anti-retaliation provision of its Title IX policy, or comply with its anti-discrimination policies.

g. MCW engaged in multiple violations of the LCME standards.

h. MCW failed to follow the AAMC standards with respect to the contents of his Dean's Letter, despite claiming it was required to follow those standards.

162. Plaintiff is entitled to recover damages for MCW's breach of the express and/or implied contractual obligations described above.

163. As a direct and proximate result of the above conduct, Plaintiff sustained tremendous damages, including, without limitation, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

164. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

## FIFTH CAUSE OF ACTION:
## STATE LAW PROMISSORY ESTOPPEL

165. Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

166. Deans Havas and Misra told Dr. Kutty in their official capacities as Deans of MCW and in the course of performing their official MCW duties that the Disciplinary Probation would not go on Dr. Kutty's educational record, would not be reported in this Dean's Letter, and would not have any negative consequences.

- 31 -

167.    Those statements constitute representations and promises that MCW should have reasonably expected to induce action or forbearance by Dr. Kutty.

168.    MCW expected or should have expected Dr. Kutty to accept its representation about the Disciplinary Probation in deciding to make the substantial decision affecting his career to not pursue alternative avenues of relief to challenge that decision.

169.    MCW's promise about the Disciplinary Probation did in fact induce Dr. Kutty to not challenge the probation decision as he chose not to do so solely because of the representation that it would not harm his future prospects, including being disclosed on his Dean's Letter.

170.    Dr. Kutty relied to his detriment on these promises about the Disciplinary Probation because he could have taken immediate action to seek a declaration the discipline was wrongful or an injunction prohibiting its enforcement long before he would have had to apply for residencies to avoid the harm to those applications the Dean's Letter caused.

171.    Injustice can only be avoided by enforcing the promise.

172.    Based on the foregoing, MCW is liable to Plaintiff based on promissory estoppel.

**WHEREFORE**, the Plaintiff, Dr. Raman Kutty, respectfully requests that this Court grant the following relief:

a.    A judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, compensatory damages, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and career opportunities, and loss of future career prospects;

b.    A declaration that (i) Plaintiff's reputation be restored; (ii) Plaintiff's disciplinary record be expunged; (iii) Plaintiff's Dean's Letter be amended; and (iv)

- 32 -

Plaintiff be restored to the position he would have been in but for the discriminatory

Disciplinary Probation in consideration for candidacy for residency;

   c.  An award of Plaintiff's reasonable attorney's fees and costs; and

   d.  Such other and further relief to which Plaintiff may show himself to be

justly entitled.


**PLAINTIFF REQUESTS TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**


Respectfully submitted this 30th day of May, 2019.


      s/ Jennifer S. Walther
      State Bar No. 1001551
      Attorney for Plaintiff,
      Dr. Raman Kutty
      MAWICKE & GOISMAN, S.C.
      1509 N. Prospect Avenue
      Milwaukee, WI 53202
      Telephone:  (414) 224-0600
      Fax:  (414) 224-9359
      Email:  jwalther@mawickelaw.com